**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180622-U

Order filed January 27, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 21st Judicial Circuit, Kankakee County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0622 Circuit No. 18-CF-21 |
| DARRIN L. EDWARDS, | ) ) ) | Honorable Kathy S. Bradshaw-Elliott, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justices Lytton and Daugherity concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:  The circuit court's failure to comply with Illinois Supreme Court Rule 431(b) is not a reversible plain error, as the evidence is not closely balanced.

¶ 2    The defendant, Darrin L. Edwards, appeals from his conviction for predatory criminal sexual assault of a child. He contends that the Kankakee County circuit court erred by failing to properly question jurors as required by Illinois Supreme Court Rule 431(b) (eff. July 1, 2012).

¶ 3                                    I. BACKGROUND

¶ 4        The State charged the defendant with predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)). The charge alleged that the defendant committed an act of sexual penetration with N.M., who was less than 13 years of age. On June 4, 2018, the cause proceeded to a jury trial.

¶ 5        During jury selection, the court asked only three members of the eventual jury whether they understood and accepted that (1) the defendant is presumed innocent of the charge against him, (2) the State must prove the defendant's guilt beyond a reasonable doubt, (3) the defendant is not required to offer any evidence on his own behalf, and (4) if the defendant does not testify it cannot be held against him. The court failed to ask the remaining jurors whether they understood and accepted these principles.

¶ 6        At trial, Tierra M. testified that she was the mother of N.M. and N.M.'s siblings, Na.M. and A.B. She and Lemoris B. raised N.M., Na.M., and A.B. until the couple separated in 2014. Lemoris was the biological father to only A.B. Following the separation, the children lived with Lemoris at the defendant's residence on Schuyler Avenue in Kankakee. In addition to Lemoris and the children, Lemoris's mother, Cynthia; his stepfather, the defendant; and his teenaged half-brother, M.E., also lived at the defendant's residence. Around June 2017, Lemoris, Cynthia, the defendant, M.E., Na.M., and A.B. moved to a home on Elm Avenue in Kankakee. When the family moved to Elm Avenue, N.M. moved in with Tierra.

¶ 7        On January 1, 2018, the children were at Tierra's house. Na.M. and A.B. began accusing each other of touching the other inappropriately. When Tierra spoke with N.M. about these allegations, N.M. began to fidget and look at her hands. N.M. then stopped fidgeting and began to cry. N.M. said that the defendant "touches me in places that I don't want to be touched." Later, N.M. told Tierra that the defendant had inappropriate sexual contact with her on two

occasions, once in the house on Schuyler Avenue, and another in the house on Elm Avenue. The incident on Elm Avenue occurred between December 13 and 25, 2017.

¶ 8 Tierra informed Lemoris of N.M.'s allegations and brought N.M. to the Elm Avenue house. On the way, N.M. said the defendant "put his thing in her butt." When they arrived at the residence, N.M. spoke with Lemoris, and Tierra confronted the defendant. Tierra became frustrated with him, and someone called the police. When the police arrived, an officer told Tierra to take N.M. to the hospital. There, a hospital employee spoke with N.M. and conducted only a visual examination because the sexual assault reported by N.M. was too remote to conduct a full sexual assault examination.

¶ 9 Tierra also described an incident in the summer of 2016, where she disciplined N.M. for creating a Facebook account and using that account to send inappropriate sexual messages to boys. N.M. told Tierra that the defendant occasionally took her iPod, and when he returned it there was "nasty stuff on there." On cross-examination, Tierra stated she was unaware of an incident where "the boys" were caught "humping" N.M.

¶ 10 N.M. testified that she was 11 years old at the time of trial. Around June 2017, N.M. moved in with Tierra. Before living with Tierra, N.M. lived at the defendant's residence on Schuyler Avenue. At that time, she was nine years old. Between December 2017 and the beginning of January 2018, she visited Lemoris and her siblings at the defendant's residence on Elm Avenue. N.M. referred to the defendant as "papa." N.M. did not get along with the defendant. The defendant yelled at her for not doing chores and not doing them correctly. N.M. described an incident when she got in trouble with the defendant and Cynthia for "hugging" M.E. The defendant talked to them about "[h]ow we shouldn't do stuff that he said we were doing." N.M. also described incidents where the defendant called her into his bedroom and

showed her "naked people and stuff" on electronic devices. N.M. stated that Tierra also disciplined her for opening a Facebook account. N.M. admitted that she sent inappropriate messages using the account. She stated that she learned about that "stuff" from what the defendant was watching and saying.

¶ 11 On an evening in December 2017, N.M. and Na.M. were upstairs watching television in Na.M.'s room at the Elm Avenue house. At the time, Lemoris was asleep in his room, and Cynthia, M.E., and A.B. were out of the house. N.M. went to the kitchen to get water. While she was in the kitchen, the defendant told her that he needed help with the laundry in the basement. N.M. told the defendant he could do it himself. The defendant yelled at N.M., and she went downstairs to retrieve the defendant's clothes from the dryer. Before N.M. made it up the stairs, the defendant pulled her onto M.E.'s bed. The defendant turned N.M. around so that he was behind her and removed her shorts and his pants. The defendant "put his thing in [N.M.'s] butt." N.M. said, "it hurted." When the garage door opened, the defendant stopped, dressed, and left the basement. Later, when N.M. went to the bathroom, she noticed that when she urinated, "some white stuff came out." When she returned to Na.M.'s bedroom, she told Na.M. that the defendant had sexually assaulted her. N.M. asked Na.M. not to tell anyone about the incident. N.M. did not tell Lemoris because she was scared and did not want to wake him.

¶ 12 In addition to the Elm Avenue incident, N.M. described three prior instances of inappropriate contact that occurred in the basement at the Schuyler Avenue house. Like the Elm Avenue house, the washer and dryer were in the basement. Once, when N.M. was washing clothes, the defendant came down to the basement. N.M. tried to go upstairs, and the defendant grabbed her arm and pulled her to the floor. While N.M. was on her hands and knees, the

4

defendant pulled down her underwear and his pants, and "then he was finna pull his thingy out." The defendant stopped when he heard someone coming.

¶ 13    N.M. described a second incident at the Schuyler Avenue house where the defendant had "hump[ed]" her. Again, N.M. was on her hands and knees, and the defendant was on his knees behind her. They were both fully clothed. The defendant touched her buttocks with the front of his pants and moved his body forward and backward. N.M. told the defendant to get off, but he did not. The defendant said if she told anybody about what happened, "he would come after" N.M. and her family.

¶ 14    N.M. described a third incident at the Schuyler Avenue house where the defendant attempted to "hump" her while she was on her hands and knees. The defendant was on his knees, removed N.M.'s and his pants, and touched N.M.'s buttocks with his penis. Defendant stopped then he heard a noise.

¶ 15    On cross-examination, N.M. agreed that when she initially disclosed the incident at the Elm Avenue house during her Children's Advocacy Center (CAC) interview, she said that it happened only once between December 13, 2017, and Christmas. N.M. told the CAC interviewer the incident occurred around 12 or 1 a.m. on a weekend during winter break. She did not state that she went to get the laundry out of the dryer for the defendant in the middle of the night. She told the CAC interviewer she wore leggings but testified that she wore shorts. She did not know where Cynthia, M.E., and A.B were during the incident but thought they might have been in Chicago for a church event and came home around midnight. N.M. denied being caught by the defendant "humping" M.E. and Na.M. She also denied taking the defendant's phone to show M.E. and Na.M. pictures of naked people.

¶ 16    Andrea Longtin, a CAC interviewer, testified that she interviewed N.M. on January 3, 2018. A recording of the interview was entered into evidence and played for the jury.

¶ 17    N.M.'s CAC interview was largely consistent with her trial testimony. *Supra* ¶ 11. However, unlike her trial testimony, during the interview N.M. said that prior to the December 2017 incident, she and Na.M. played a video game. The defendant approached N.M. around 12 or 1 a.m. and said he needed her to do something for him. At the time, N.M. was wearing leggings. N.M. went to the basement where the defendant told her to sit on a bed. The defendant then turned N.M. around and held her hands down. N.M. saw the defendant's "thing," which she identified as the defendant's penis.

¶ 18    Later in the interview, N.M. said the defendant had engaged in similar acts before at the Schuyler Avenue residence. However, those instances differed from the December 2017 incident because the defendant did not remove his pants or put his "thing" in her buttocks. N.M. was eight or nine years old at the time of the first incident. Initially, N.M. denied that the defendant made any threats to her. However, at the end of the interview, she stated that the defendant had threatened to hurt her family if she told anyone about what happened.

¶ 19    Na.M. testified that at the time of trial, he was ten years old and lived at the Elm Avenue house. On a weeknight in December 2017, while Na.M. was out of school for Christmas break, he and N.M. watched a movie upstairs. During the movie, N.M. left to get water from the kitchen. When she returned, N.M. said that the defendant had sexually assaulted her. N.M. asked Na.M. not to tell anyone about the incident. At the time of the incident, Na.M. thought Cynthia was in her bedroom and was unsure where Lemoris was but thought he had left to buy food.

¶ 20    Lemoris testified that he lived at the defendant's residence on Elm Avenue. Lemoris was not N.M. or Na.M.'s biological father but had been a father figure in their lives since they were

6

young. Lemoris said that N.M. was left alone with the defendant once or twice at the Schuyler Avenue house. When the family moved to Elm Avenue around June of 2017, N.M. stayed overnight multiple times per week but lived with Tierra. In March or May 2017, and before N.M. moved in with Tierra, Lemoris noticed that N.M.'s behavior changed.

¶ 21    On January 1, 2018, after Tierra notified Lemoris of N.M.'s allegations, he confronted the defendant. The defendant denied the allegations. When Tierra brought N.M. to the Elm Avenue residence, N.M. told Lemoris that the defendant "had been sticking his thing in her butt."

¶ 22    Lemoris knew that the defendant had disciplined N.M. The defendant never mentioned to him that N.M., Na.M., or A.B. exhibited any sexually inappropriate behavior. Lemoris observed that when the defendant drank alcohol, he would "get touchy" and playful with the children. One night, Lemoris discovered the defendant passed out from alcohol consumption in N.M.'s bed. The defendant's behavior caused Lemoris concern.

¶ 23    On cross-examination, Lemoris stated that there was one evening in December 2017 when he attended a Christmas party. He stated that, on nights where he was not home or worked late, he asked the defendant or Cynthia to watch the children. Cynthia was not always available in the evenings due to the church events that she attended on Thursday evenings and some weekend evenings. M.E. and A.B. attended the services with Cynthia. Lemoris could not recall a night where Cynthia, M.E., and A.B. were out of the house at midnight between December 13 and 25, 2017.

¶ 24    Lemoris stated that initially, he felt the defendant's discipline of N.M. was appropriate. However, later, he felt that the defendant and Cynthia were "picking on her." Around June 2017,

7

after N.M. moved in with Tierra, she told Lemoris that she did not want to be around the house because of the defendant, but she did not tell him why.

¶ 25        Samatra Kinkade testified that she was an emergency room (ER) nurse. On January 1, 2018, Kinkade met N.M. at the hospital. N.M. was "tearful and rubbing her hands together and kept looking down and then back up and seemed nervous." N.M. disclosed that she had been sexually assaulted on and off for the preceding two years. The most recent incident occurred approximately two weeks before the hospital visit. N.M. was unsure of the exact date. N.M. explained that, during this incident, the defendant restrained her and put his penis into her buttocks. N.M. did not know if the defendant ejaculated. Because the assault occurred more than seven days before the hospital visit, Kinkade did not conduct a full examination. Kinkade conducted a visual examination of N.M.'s body, anus, and vagina. Kinkade did not observe any signs of sexual abuse. Kinkade testified that, even if N.M. had been injured during the sexual assault, her injuries likely would have healed before the examination.

¶ 26        The defense called Cynthia to testify. Cynthia stated that Lemoris and M.E. were her sons. M.E. was her and the defendant's son. N.M. had lived at the defendant's residence since the separation, and Cynthia saw her every day. She stated that in the last few years, N.M. had developed an "attitude." When Cynthia asked N.M. to do her chores, N.M. refused. The defendant told Cynthia about an incident where M.E., Na.M., and N.M. acted out sexually. After the incident, Cynthia, the defendant, and Lemoris disciplined the children.

¶ 27        Cynthia attended church services regularly, including a Tuesday night bible study from 7 to 8:30 p.m. and a Thursday evening service. She reviewed her church event calendar for December 2017 and determined that she had not left the house at any time between 10 p.m. and 1 a.m. on any night that month. Additionally, M.E. was not out of the home during that time

frame either. Cynthia did not know if the defendant drank alcohol in December 2017. However, Cynthia was aware of an incident where the defendant fell asleep in the children's room after drinking alcohol.

¶ 28 On cross-examination, Cynthia stated that she attended church twice a week. She regularly attended a Thursday night service, which began at 7:30 p.m. and could last until 11 p.m.

¶ 29 M.E. testified that he was 15 years old at the time of trial. M.E.'s bedroom was in the basement of the Elm Avenue house. M.E. did not spend the night out of his house in December 2017. He did not recall traveling for a church event in December 2017. He also did not recall returning from church at midnight or 1 a.m. M.E. remembered an incident where N.M. stole the defendant's phone and showed him pornography.

¶ 30 The defendant testified that he considered N.M. to be his granddaughter and had known her since she was three years old. In the year prior to N.M.'s accusations, N.M. did not want to do her chores and refused to follow his directions. N.M. talked back to the defendant and told the defendant she hated him. Because of the change in N.M.'s attitude, the defendant began distancing himself from N.M.

¶ 31 The defendant denied sexually assaulting N.M. and stated the incidents alleged by N.M. did not happen because he loved N.M. The defendant also denied watching pornography in front of the children, showing N.M. pornographic images, or borrowing N.M.'s electronic devices. The defendant acknowledged that he drank two beers at the Elm Avenue house in December 2017, while the children were not home.

¶ 32 On cross-examination, the defendant admitted that he formerly consumed alcohol to the point that he would pass out. The defendant explained that if he was drinking alcohol while he

played with the children, he would become "rough" with the children. After one of these incidents, he and Lemoris "decided that [the defendant] would not interact with them at all." When questioned by police, the defendant said that he watched pornography and preferred anal sex.

¶ 33    The defendant further detailed an instance in which he caught N.M., Na.M., and M.E. having a "threesome" in M.E.'s bedroom. After this incident, the defendant, Cynthia, and Lemoris disciplined the children. The defendant admitted that Cynthia informed him that he once passed out while wearing an open robe with N.M. between his legs.

¶ 34    The jury found the defendant guilty. The court sentenced the defendant to 15 years' imprisonment. The defendant appeals.

¶ 35                                   II. ANALYSIS

¶ 36    The defendant argues the circuit court failed to strictly comply with Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) because the potential jurors were not asked questions regarding their understanding and acceptance of the principles listed in the rule. The State concedes that the court failed to strictly comply with Rule 431(b), but argues the defendant forfeited review of this issue. The defendant acknowledges his forfeiture but argues that this error is a reversible plain error because the evidence is closely balanced.

¶ 37    Under the plain error doctrine, we must first determine whether a plain error occurred. "The word 'plain' *** is synonymous with 'clear' and is the equivalent of 'obvious.' " *People v. Piatkowski*, 225 Ill. 2d 551, 565 n.2 (2007). If we determine that the circuit court committed a plain error, then the second step is to determine whether the error is reversible. *Id.* A plain error is reversible when "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error." *Id.* at 565. The

10

first step of the plain error analysis is to determine whether an error occurred. *People v. Eppinger*, 2013 IL 114121, ¶ 19.

¶ 38    Here, the State concedes that the circuit court erred by failing to properly question each juror under Rule 431(b). After reviewing the record, we accept the State's concession. We find that the court did not ask each of the jurors whether they understood and accepted the principles:

> "(1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that if a defendant does not testify it cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's decision not to testify when the defendant objects." Ill. S. Ct. R. 431(b) (eff. July 1, 2012).

As this is a plain error, we must next determine whether it is subject to reversal under the closely balanced prong.

¶ 39    To determine if the evidence is closely balanced, "[A] reviewing court must undertake a commonsense analysis of all the evidence in context." *People v. Belknap*, 2014 IL 117094, ¶ 50. This "inquiry involves an assessment of the evidence on the elements of the charged offense or offenses, along with any evidence regarding the witnesses' credibility." *People v. Sebby*, 2017 IL 119445, ¶ 53. Evidence can be closely balanced when each party presented credible witnesses or where the credible testimony of a witness is countered by evidence that casts doubt on his or her account. *Id.* ¶ 63. "No 'credibility contest' exists when one party's version of events is unrefuted, implausible, or corroborated by other evidence." *People v. Jackson*, 2019 IL App (1st) 161745, ¶ 48.

11

¶ 40    As charged in this case,

> "A person commits predatory criminal sexual assault of a child if that person is 17
> years of age or older, and commits an act of contact, however slight, between the
> sex organ or anus of one person and the part of the body of another for the
> purpose of sexual gratification or arousal of the victim or the accused, or an act of
> sexual penetration, and:
>
>> (1) the victim is under 13 years of age." 720 ILCS 5/11-1.40(a)(1) (West
> 2016).

¶ 41    The instant case largely turned on a credibility determination between N.M.'s accusations of sexual penetration by the defendant, and the defendant's attempts to discredit N.M. and portray her story as the fabrication of an oversexualized minor. Nevertheless, N.M.'s trial testimony established each of the elements of predatory criminal sexual assault of a child. N.M. testified that she was 11 years old at the time of the trial, and the defendant, whom she considered her grandfather, placed his penis in her buttocks for the purpose of sexual gratification. According to Tierra, an emotionally distraught N.M. reported this incident to her in early January 2018. N.M. also told Lemoris that the defendant had placed his penis into her buttocks. After confronting the defendant, Tierra took N.M. to the hospital where, according to the attending ER nurse, Kinkade, N.M. provided an emotional description of the defendant's sexual penetration. In addition to this testimony, Na.M.'s testimony confirmed that N.M. initially reported the defendant's sexual penetration to him. The CAC interview further confirmed N.M.'s allegations where she described the sexual penetration consistent with her trial testimony.

¶ 42    In addition to N.M.'s report of the December 2017, incident, N.M. recalled three prior incidents where the defendant engaged in similar conduct. In each of these prior incidents, the

12

defendant lured or forced N.M. into the basement where he positioned N.M. on her hands and knees, knelt behind her, and "humped" her buttocks. While the extent to which the defendant attempted to sexually penetrate N.M. during these three prior incidents varied, they established a clear pattern of behavior that culminated in the December 2017 incident. The similarity of the defendant's actions thus lends credibility to N.M.'s description of the defendant's December 2017 sexual penetration.

¶ 43        N.M.'s accusations are further corroborated by the plausibility of the assault location. Lemoris testified that when he was in the residence with N.M., she could be elsewhere in the home out of his view. N.M. stated Lemoris and Na.M. were upstairs, while Cynthia, M.E., and A.B. were out of the residence. According to the testimony and the residence's layout, it is plausible that an incident occurred in the basement without the knowledge of someone located on one of the higher floors.

¶ 44        Moreover, the defendant had an opportunity to commit the assault. Cynthia testified that she was not out of the house for church any night in December 2017 from 10 p.m. to 1 a.m. and did not travel for any church events. However, she contradicted her own testimony when she stated that she regularly attended the Thursday service, which could last until 11 p.m. Similarly, M.E. testified that he attended church with Cynthia and could have been out of the residence during the time of the incident.

¶ 45        Faced with N.M.'s consistent accusation and description of the December 2017 sexual contact, the defendant argues that N.M.'s testimony included so many inconsistencies that it was incredible. However, the inconsistencies the defendant relies on in making this argument regard minor details that surround the sexual penetration. For example, the defendant argues that N.M. provided differing times and dates that the incident occurred, descriptions of her activities before

13

the incident, and descriptions of her clothing. N.M. originally stated the assault occurred at 12 or 1 a.m., but later testified it was 10 or 11 p.m. First, N.M. stated she was playing a video game with Na.M., then later testified that they were watching a movie. N.M. initially stated she wore leggings but testified that she wore shorts. However, each of these minor inconsistencies fails to discredit her consistent and repeated description of the defendant's sexual penetration.

¶ 46 The defendant further points to inconsistencies between the testimony of Na.M. and N.M. regarding the date of the incident and Lemoris's location at the time of the incident. N.M. testified that the incident occurred on a weekend, while Na.M. stated it was a weekday. N.M. testified that Lemoris was asleep upstairs, while Na.M. stated he was out of the residence. While these inconsistencies are apparent on the face of the record, they do little to detract from N.M.'s consistent testimony that established the elements of predatory criminal sexual assault of a child.

¶ 47 In an attempt to further undermine N.M.'s credibility, the defendant elicited evidence that N.M. had engaged in sexual misconduct with the other minors and was generally disrespectful to him and Cynthia. However, this evidence does not directly refute the sexual penetration described by N.M.'s testimony, the testimony of other witnesses, and the CAC interview.

¶ 48 We conclude that the evidence in this case was not close. Viewed in context, N.M.'s testimony plus that of the State's other witnesses and the recorded interviews, conclusively established all of the elements of predatory criminal sexual assault of a child. Therefore, the court's Rule 431(b) plain error is not a reversible plain error.

¶ 49                                    III. CONCLUSION

¶ 50 The judgment of the circuit court of Kankakee County is affirmed.

¶ 51 Affirmed.